[Cite as *State v. Jackson*, 2020-Ohio-2677.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

MADISON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2019-03-006 |
| | : | O P I N I O N |
| - vs - | | 4/27/2020 |
| | : | |
| TEVIN JACKSON, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM MADISON COUNTY COURT OF COMMON PLEAS
Case No. CRI20180011

Stephen J. Pronai, Madison County Prosecuting Attorney, Nicholas A. Adkins, 59 North Main Street, London, Ohio 43140, for appellee

Rion, Rion & Rion, L.P.A., Inc., Jon Paul Rion, Catherine H. Breault, Bradley Anderson, 130 W. Second Street, Suite 2150, Dayton, Ohio 45402, for appellant

**HENDRICKSON, P.J.**

{¶ 1} Appellant, Tevin Jackson, appeals the denial of his motion to suppress and his convictions in the Madison County Court of Common Pleas for murder, felonious assault, aggravated burglary, and having weapons while under disability. For the reasons detailed below, we affirm the trial court's decisions.

{¶ 2} On February 15, 2018, appellant was indicted by the Grand Jury of Madison County for aggravated murder, murder, attempted murder, felonious assault, aggravated burglary and having weapons while under disability. Aside from the weapons while under disability charge, all counts of the indictment included a firearm specification pursuant to R.C. 2941.145(A).

{¶ 3} The charges of the indictment stemmed from events that occurred on January 22, 2018 in Madison County. That evening, appellant and a friend, Justin Coffey, went to the apartment of William Benson and Zachary Edmond in London, Ohio to collect money Benson owed to Coffey for marijuana. Appellant and Coffey entered the apartment and a struggle ensued between the four individuals. After several gunshots were fired inside the apartment, Benson and appellant moved the altercation to the front yard, where a surveillance camera recorded the remainder of the incident. The surveillance footage shows appellant and Benson struggling on the ground, followed by appellant shooting Benson in the chest twice before running away. As a result of the encounter, all four individuals suffered gunshot wounds. Benson and Coffey ultimately died as a result of their wounds, while appellant and Edmond were successfully treated at different hospitals.

{¶ 4} After retreating from the apartment, appellant met his cousin at a nearby motel. Appellant's cousin drove appellant to the Springfield Regional Medical Center ("SRMC"), a hospital over thirty minutes from the apartment and outside Madison County, despite having access to a hospital only five minutes from the apartment. When appellant arrived at SRMC, he informed the hospital staff that he had been shot. At that point, staff notified the Springfield Police Department that a gunshot victim had arrived at the hospital. In response, officers with the Springfield Police Department were dispatched to SRMC. When the officers arrived at the hospital, appellant indicated that he had been shot by a person he did not know while sitting in his car on the southside of Springfield. While in

appellant's room, the officers noticed bloody clothing on the floor, including a bloody t-shirt and pair of jeans, which was collected and subsequently tested for DNA.

{¶ 5} That same evening, while appellant was in the hospital, officers with the London Police Department became aware of the altercation that had occurred at the apartment and began investigating Coffey's injuries, Edmond's injuries, and Benson's death.

{¶ 6} Thereafter, appellant was transferred to Miami Valley Hospital in Dayton, Ohio, which informed the London Police Department that appellant was being treated at the hospital. The London Police Department then notified the Madison County Sheriff's Office that appellant was located at Miami Valley Hospital, and a lieutenant with the sheriff's office went to the hospital to interview appellant. During that interview, appellant reiterated that he was shot while sitting in his car with an individual he did not know. According to appellant, the shooting occurred on Euclid Avenue in Springfield.

{¶ 7} As a result of the investigation into the events that occurred at the apartment, appellant was indicted for the aggravated murder of Benson, murder of Coffey, attempted murder of Edmond, felonious assault of Edmond, and for committing aggravated burglary at the apartment.

{¶ 8} In June 2018, appellant moved the trial court to suppress certain evidence obtained during the investigation. In July 2018, appellant amended his motion to suppress. Relevant to this appeal, appellant argued in his amended motion that the trial court should suppress the clothing evidence seized by the Springfield Police Department without a search warrant, including appellant's belt, pants, and shirts, for the reasons that appellant had a Fourth Amendment possessory right in the clothing and because the Springfield Police Department illegally obtained the clothes, and thereby violated appellant's rights.

{¶ 9} After a hearing, the trial court denied appellant's motion. With regard to the clothing evidence seized by the Springfield Police Department, the trial court found that appellant did not retain a reasonable expectation of privacy in his clothing, and therefore, his Fourth Amendment rights were not violated.

{¶ 10} Three days before the trial court denied appellant's motion, appellant filed a supplemental motion to suppress relating to the search and seizure of appellant's cellular service location information. On October 29, 2018, the trial court held a hearing regarding appellant's supplemental motion. Additional discovery was completed and the parties stipulated to the admission of the additional evidence and renewed their prior arguments. The trial court determined its analysis was not altered by the newly introduced evidence, and denied the motion in each and every particular.

{¶ 11} Appellant elected to have the weapons while under disability charge tried to the trial court, and the remaining charges were tried to the jury. After a three-day jury trial, the jury returned not guilty verdicts for the aggravated murder and attempted murder charges, but found appellant guilty of murder, felonious assault, and aggravated burglary. The jury further found appellant guilty of a firearm specification related to the felonious assault charge. The trial court also found appellant guilty of having weapons while under disability. As a result of the guilty verdicts, the trial court sentenced appellant to an aggregate sentence of 37 years to life.

{¶ 12} Appellant now appeals, raising three assignments of error for our review. For the ease of discussion, we will address appellant's assignments of error out of order.

{¶ 13} Assignment of Error No. 3:

{¶ 14} THE TRIAL COURT ERRORED [sic] IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS REGARDING THE CLOTHING COLLECTED AND SEIZED FROM THE BODY OF MR. JACKSON BY THE SPRINGFIELD POLICE DEPARTMENT,

WHICH INTERFERED WITH MR. JACKSON'S CONSTITUTIONALLY PROTECTED POSSESSORY INTEREST.

{¶ 15} In his third assignment of error, appellant argues the trial court erred by denying his motion to suppress evidence obtained from the warrantless seizure of his bloody clothing from the hospital.

{¶ 16} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St. 3d 152, 2003-Ohio-5372, ¶ 8. When considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *Id.* Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* Accepting these facts as true, the appellate court must then independently determine, as a matter of law, and without deference to the trial court's conclusions, whether the trial court applied the proper legal standard. *Id.*

{¶ 17} In his motion to suppress, appellant argued the trial court should suppress the clothing evidence seized by the Springfield Police Department from SRMC because he maintained a constitutionally protected possessory interest in his clothing at the time of the seizure, and therefore, the seizure was in violation of his Fourth Amendment rights. We disagree.

{¶ 18} The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their * * * effects * * * against unreasonable searches and seizures." According to the United States Supreme Court, to challenge a seizure, a defendant need only establish that the seizure interfered with his constitutionally protected possessory interests. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652 (1984).

{¶ 19} Warrantless seizures of personal property are generally considered unreasonable under the Fourth Amendment unless there is probable cause to believe the property is or contains contraband or evidence of a crime and the seizure falls within an established exception to the warrant requirement. *United States v. Place*, 462 U.S. 696, 701, 103 S. Ct. 2637 (1983). One such exception is the plain view doctrine. *State v. Buzzard*, 112 Ohio St. 3d 451, ¶ 16. The plain view doctrine represents the requirement that an individual must protect his or her privacy, and should an officer observe items in plain view from a place where the officer is entitled to be, no warrant is required. *Id*. Thus, it is well established that pursuant to the plain view doctrine, a police officer lawfully on a person's property may seize evidence in plain view without a warrant. *State v. Young*, 12th Dist. Warren No. CA2014-05-074, 2015-Ohio-1347, ¶ 28.

{¶ 20} The plain view doctrine authorizes the warrantless seizure of evidence if the initial intrusion leading to the discovery of the evidence was lawful and the incriminating or illegal nature of the items was immediately apparent. *State v. Simmons*, 12th Dist. Butler No. CA2012-11-229, 2013-Ohio-5088, ¶ 18. The "immediately apparent" requirement is satisfied when police have probable cause to associate an object with criminal activity. *Young* at ¶ 29. The requisite probable cause may arise from the character of the property itself or the circumstances in which it is discovered, and police officers may rely on their specialized knowledge, training, and experience in establishing probable cause to identify items as contraband. *Id*.

{¶ 21} At the hearing on appellant's motion to suppress, the state presented testimony from the officer with the Springfield Police Department who initially interviewed appellant at SRMC. The officer testified that on January 22, 2018, he and a fellow officer were dispatched to SRMC regarding a gunshot victim who had arrived at the hospital. Upon arriving at SRMC, the officers were directed to appellant by the hospital staff. When the

officers initially arrived, appellant was in one of the hospital trauma rooms surrounded by medical staff. At some point, the officer observed appellant's clothing in a pile on the floor. The clothes included a pair of blue jeans, a white t-shirt, and a long-sleeved shirt. According to the officer, the clothes were bloody and were in a pile after staff had cut them off appellant. After observing the bloody clothes, the officer put the clothes in a plastic bag from SRMC, as the blood would have soaked through the paper bags typically utilized by the police department. Those clothes were then returned to the police department and the officer completed a property receipt.

{¶ 22} The officer also testified that appellant informed the officer he was sitting in his parked vehicle "somewhere on the south side" of the City of Springfield, when an unknown individual came up, shot appellant, and ran away. As a result of appellant's statement, the officer treated appellant as a gunshot victim, and confirmed at the hearing that he had no reason to believe appellant was anything other than a victim.

{¶ 23} The state also presented testimony from a nurse and clinical educator in SRMC's emergency room. The nurse testified that in her role as a clinical educator, she provides education to the staff of SRMC and is familiar with the guidelines and procedures at the hospital. The nurse then detailed SRMC's guidelines on how to care for a patient with a gunshot wound. According to the nurse, when treating a gunshot wound, it is the hospital's policy to "[r]emove the patient's clothing to expose the wound and allow for a head-to-toe assessment. Take care when removing the clothing to prevent exacerbating the injury and causing additional pain." The nurse continued, and indicated that SRMC's staff is directed not to leave any removed clothing unattended to preserve the chain of custody. Instead, the staff is directed to place all of the patient's belongings into a paper bag. The hospital's policy further directs its staff to notify local law enforcement agencies of the gunshot wound patient, if they are not already aware, and to follow the chain of

custody when turning over potential evidence to law enforcement personnel. The nurse further testified that SRMC's staff, including its emergency room staff, is prohibited from giving the patient's personal belongings to anyone other than a law enforcement officer. According to the nurse, when there is a gunshot wound patient, the patient's clothing is usually collected by law enforcement, but if law enforcement does not collect the clothing, it is returned to the patient or the family.

{¶ 24} The nurse further testified SRMC's staff is told to follow the guidelines and procedures, and if police officers arrive at the hospital in response to a gunshot wound patient, the emergency room staff is supposed to follow the policy and give the officers the clothing. The nurse indicated that it is not unusual for the officers to collect clothing themselves, and that the hospital allows officers to do so. However, the nurse also confirmed that SRMC is not responsible for the patient's property, nor does it have any possessory right to the patient's property.

{¶ 25} After considering the evidence presented at the hearing, we find appellant's Fourth Amendment rights were not violated when the officers seized his bloody clothing off the floor at SRMC. Various federal courts have recognized that a hospital patient retains a possessory interest in his or her clothing. *See, e.g., United States v. Davis*, 690 F. 3d 226, 234-35 (4th Cir.2012); *Jones v. State*, 648 So. 2d 669, 675 (Fla.1995); *United States v. Neely*, 345 F.3d 366, 369 (5th Cir.2003). In the case at bar, the record reflects that although the clothing at issue was on the floor, cut, and bloody, appellant never relinquished his possessory interest in the clothing while at SRMC. Rather, pursuant to SRMC's policy, if the clothing had not been collected by law enforcement officers, it would have been returned to appellant or his family. This is because, as the nurse testified, the clothing did not belong to SRMC and the hospital did not retain any possessory right to the patient's property.

{¶ 26} However, even if appellant maintained a possessory interest in his clothing at the time of the seizure, we find the warrantless seizure was reasonable under the Fourth Amendment pursuant to the plain view doctrine, an established exception to the warrant requirement. According to the record, the officers were at the hospital on official police business, as they were dispatched to SRMC when appellant, an alleged gunshot victim, presented himself at the hospital. This dispatch was in accordance with SRMC's policy to notify local law enforcement agencies of any gunshot wound patients. Thus, the record is clear that the officers were lawfully in appellant's room when they observed the bloody clothing in plain view on the floor. Additionally, it is apparent from the record that the officers had probable cause to associate appellant's clothing with criminal activity. Although the officers initially believed appellant was a victim at the time of the seizure, the clothing remained evidence of the gunshot-related crime the officers were called to investigate. Thus, regardless of appellant's initial status as the victim, we find it is immaterial to the plain view analysis that the clothing did not immediately incriminate appellant as the perpetrator of any crime. Rather, due to the existence of blood on the clothing, as well as appellant's presence at SRMC as a gunshot victim and his allegation that he was shot by an unknown individual in his car, the clothing was clearly evidence of criminal activity. As a result, we find the seizure of appellant's clothing from the SRMC emergency room was lawful and did not violate appellant's Fourth Amendment rights.

{¶ 27} For these reasons, the trial court did not err by denying appellant's motion to suppress evidence obtained from the warrantless seizure of his bloody clothing from SRMC. Accordingly, appellant's third assignment of error is overruled.

{¶ 28} Assignment of Error No. 1:

{¶ 29} THE TRIAL COURT DENIED MR. JACKSON HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY DENYING DEFENSE COUNSEL'S MOTION FOR A MISTRIAL.

{¶ 30} Appellant also argues the trial court abused its discretion by denying his motion for a mistrial.

{¶ 31} "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened[.]".  *State v. Reynolds,* 49 Ohio App.3d 27, 33 (2d Dist. 1988).  The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin,* 62 Ohio St. 3d 118, 127 (1991); *State v. Treesh,* 90 Ohio St. 3d 460, 480 (2001). When reviewed by the appellate court, we should examine the climate and conduct of the entire trial, and grant "great deference to the trial court's discretion * * * in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial."  *State v. Glover,* 35 Ohio St. 3d 18, 19, (1988).

{¶ 32} In this case, appellant orally moved for a mistrial during voir dire after the prosecutor questioned a prospective juror's ability to determine a person's credibility.  It is well settled that the trial judge has discretion over the scope, length, and manner of voir dire.  *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 40; *State v. Getsy,* 84 Ohio St.3d 180, 190, 1998-Ohio-533.  As such, we will not find prejudicial error in a trial court's decision to conduct voir dire or how the voir dire is conducted unless appellant can show "a clear abuse of discretion."  *State v. Cornwell,* 86 Ohio St.3d 560, 565, 1999-Ohio-125.

{¶ 33} The record reflects appellant moved for a mistrial after the prosecutor made the following statements to prospective juror number seven:

> What if a person has an incentive to be dishonest.  Would you consider that?  They've got skin in the game.  And maybe, you know, it's a kid and they're being accused of doing something wrong.  And so if they're truthful, they're going to get grounded.  You know, do you consider that, that there could be a consequence if they tell the truth?

{¶ 34} Defense counsel objected to the question. After a sidebar, the trial court sustained the objection and instructed the prosecutor to refrain from using the word "accused." At that time, defense counsel indicated "there would be no further action needed." The prosecutor then resumed his questioning of prospective juror number seven and stated,

> [W]e were talking about a little kid. And let's say you're investigating whether a cookie has been -- a cookie's missing off the counter, right, and you're trying to figure out what happened and you start questioning the kids in that house. When you do that, you know, do you consider whether they're going to get in trouble if they tell the truth?

{¶ 35} Defense counsel objected to the rephrased question and moved for a mistrial. Outside the presence of the venire, the trial court discussed the objection with counsel. During the discussion, defense counsel asserted the prosecutor's line of questioning infers that appellant is to be judged differently than any other witness, solely because he is accused of a crime, and that such questioning defies the concept of due process. In response, the prosecutor claimed the questions were unrelated to the testimony of appellant, but were intended to focus on ways to judge a person's credibility, including "whether there is a reason [for the person] to be deceptive." After considering counsel's arguments, the trial court determined there is a reasonable amount of latitude when dealing with issues related to the credibility of witnesses and the motivations that they may have. The trial court then denied the motion for a mistrial, and indicated "there are specific instructions that will be given that will clearly identify to the jury the manner in which they are to judge [appellant's] testimony, if he chooses the stand." The trial court further noted, "if he does not take the stand, the jury will receive instructions that will appropriately indicate that they may not consider that for any purpose."

{¶ 36} On appeal, appellant argues the prosecutor's statements put appellant's right to remain silent in question before the jury was impaneled and implied that appellant's testimony was to be judged differently than any other witness because he is accused of a crime. Thus, appellant concludes his testimony in the defense's case in chief was tainted, and that the jury's perception of appellant was skewed from the voir dire.

{¶ 37} After reviewing the record, we do not find the trial court erred in denying appellant's motion for a mistrial. That is, it was within the trial court's discretion to permit questions regarding a prospective juror's ability to determine a person's credibility, and to allow the prosecutor to ask whether she would consider a person's motive or incentive to be truthful in making that determination. Moreover, there is no indication that either set of statements cited by appellant denied him of a fair trial by an impartial jury. As to the first set of statements, the trial court sustained defense counsel's objection and later instructed the jury not to speculate or draw any inference on the truth of any question that was not answered. The trial court further instructed the jury that it may not consider appellant's indictment for any purposes. These instructions negated any inferences that could have been drawn from appellant's status as an "accused." With regard to the second set of statements, the prosecutor's comments were generic in that they did not include the words defendant or witness, nor did they explicitly or implicitly make specific reference to appellant or his decision to testify. Consequently, we do not agree that the statements led the jury to infer that appellant was to be judged differently than any other witness. Rather, the statements inquired generally into the methods of determining a person's credibility and asked whether the prospective juror would consider a person's incentive to lie.

{¶ 38} We are also unpersuaded by appellant's argument that the prosecutor's statements put appellant's right to remain silent in question before the jury was impaneled or that the statements created a presumption that appellant was going to testify, and that if

he did not, his silence would be held against him. As discussed above, we find the comments by the prosecutor were general in nature, and did not make specific reference, whether expressed or implied, to appellant or his decision to testify. Moreover, when discussing the objections, the trial court informed counsel that it would give specific instructions to the jury regardless of whether appellant elected to take the stand. Thus, appellant was not compelled to take the stand due to the prosecutor's comments. Notwithstanding his ability to remain silent, appellant testified on his own behalf, which prompted the trial court to instruct the jury regarding his testimony. Specifically, the trial court advised the jury that it must consider the credibility of the witnesses, including appellant, and "to apply the tests of truthfulness which you apply in your daily lives." The trial court indicated those tests included the witness's "intelligence, interest, and bias, if any, together with all of the facts and circumstances surrounding the testimony." The trial court further instructed that appellant's testimony was to be weighed "by the same rules that apply to other witnesses." The jury is presumed to follow the instructions of the trial court. *State v. Hancock*, 12th Dist. Warren No. CA2007-03-042, 2008-Ohio-5419, ¶ 22, citing *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 147. Thus, the jury is presumed to have considered and weighed appellant's testimony and credibility under the same standard as other witnesses.

{¶ 39} Given the context of the statements and the trial court's instructions to the jury, appellant cannot show any prejudice arising from the prosecutor's statements during voir dire. As a result, we find the trial court did not abuse its discretion in denying appellant's motion for a mistrial. Appellant's first assignment of error is therefore overruled.

{¶ 40} Assignment of Error No. 2:

{¶ 41} THE TRIAL COURT ERRORED [sic] IN OVERRULING DEFENDANT'S OBJECTION TO THE ADMISSABILITY OF STATE'S EXHIBIT 2.

{¶ 42} In his second assignment of error, appellant contends the trial court erred in admitting State's Exhibit 2, as the exhibit did not meet the threshold requirements of Evid.R. 901 and lacked any chain of custody.

{¶ 43} A trial court has broad discretion in the admission and the exclusion of evidence and unless it clearly abused its discretion and the appellant is materially prejudiced thereby, "an appellate court should not disturb the decision of the trial court." *State v. Martin*, 12th Dist. Butler No. CA2007-01-022, 2007-Ohio-7073, ¶ 9, citing *State v. Finnerty*, 45 Ohio St.3d 104, 109 (1989). An abuse of discretion is more than an error of law or judgment. Rather, it suggests the "trial court's decision was unreasonable, arbitrary or unconscionable." *State v. Perkins*, 12th Dist. Clinton No. CA2005-01-002, 2005-Ohio-6557, ¶ 8. "A review under the abuse-of-discretion standard is a deferential review." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14.

{¶ 44} Appellant initially argues the state failed to sufficiently authenticate State's Exhibit 2, the surveillance video of the incident. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901. The "threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity." *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 65. Rather, "the state only needs to demonstrate a 'reasonable likelihood' that the evidence is authentic." *Id.*, quoting *State v. Thomas*, 12th Dist. Warren No. CA2010-10-099, 2012-Ohio-2430, ¶ 15. Photographic and video evidence is generally authenticated in two ways. Pertinent to this case, a video may be authenticated by having a person with knowledge state that the video represented a "fair and accurate depiction of the actual item" at the time the video was taken. *Id.* at ¶ 66, citing Evid.R. 901(B)(1).

{¶ 45} After reviewing the record, we find the state sufficiently authenticated State's Exhibit 2. At trial, the state presented testimony from Edmond regarding the surveillance system and the footage contained in Exhibit 2. Edmond testified he attached the surveillance camera to the front door of the apartment two months before the incident occurred. According to Edmond, the camera was screwed onto the corner of the apartment's door and was activated by a motion sensor. At the time of the incident, the camera was programmed to record for 30 seconds after being activated by motion. Edmond indicated the videos are accessible through his phone, include video and audio, and are date and time stamped. Edmond also testified the surveillance camera was working on January 22, 2018 and that he did not make any deletions from the video of the incident. Edmond stated he accessed the recordings from January 22, 2018, confirmed that the recording included the incident that occurred at the apartment, and provided the audio and video to law enforcement. At that time, the state handed Edmond Exhibit 2, which he identified as the surveillance footage of the incident filmed outside his apartment. Edmond then testified that he had reviewed the recordings of Exhibit 2 and confirmed that they are a true and accurate depiction of the events from that evening.

{¶ 46} On cross-examination, defense counsel introduced Defendant's Exhibit A, which counsel described as "the complete recording provided that would include, I assume, all of what's contained in State's Exhibit 2, but maybe some additional video that was also provided[.]" After review, it appears Defendant's Exhibit A includes the footage contained in State's Exhibit 2, in addition to footage recorded on January 22, 2018 before the incident occurred. After Edmond reviewed Defendant's Exhibit A, he confirmed that it was a fair and accurate account of the surveillance video he gave to the police. Defense counsel also relied upon Defendant's Exhibit A during the direct examination of appellant. During direct examination, appellant testified the video was "consistent with everything that happened

out front[,]" and proceeded to narrate the surveillance footage in an attempt to describe the events that occurred outside of the apartment. Appellant further testified there were no gaps in the recordings and that they included "everything that happened." Defendant's Exhibit A was admitted without objection.

{¶ 47} After considering the above, we find that appellant waived any objection to the admission of State's Exhibit 2 by relying on the same video footage in its case-in-chief and cross-examination of Edmond, as well as by admitting an exhibit containing the same video footage into evidence. Notwithstanding defense counsel's admission of the same surveillance video, we further find Edmond's testimony sufficiently authenticated State's Exhibit 2, as he testified the video was what it purported to be, i.e., a true and accurate depiction of the events that occurred outside the apartment that evening. Furthermore, there is no evidence in the record which suggests the video was inaccurate. Rather, the record reflects both Edmond and appellant testified the surveillance video accurately depicted the events that took place on January 22, 2018. Accordingly, we find the state sufficiently authenticated State's Exhibit 2.

{¶ 48} Next, appellant argues that the state failed to prove chain of custody regarding Exhibit 2. "A chain of custody is part of the authentication and identification requirement for the admission of evidence under Evid.R. 901." *State v. Glover*, 12th Dist. Brown No. CA2015-01-003, 2015-Ohio-3707, ¶ 30, citing *State v. Rigdon*, 12th Dist. Warren No. CA2006-05-064, 2007-Ohio-2843, ¶ 14, citing *State v. Brown*, 107 Ohio App.3d 194, 200, (3d Dist.1995). The State bears the burden of establishing a chain of custody and is required only to "'establish that it is reasonably certain that substitution, alteration, or tampering did not occur.'" *Id.*, citing *State v. Miller*, 12th Dist. Preble No. CA2002-02-004, 2002-Ohio-6109, ¶ 18, quoting *State v. Blevins*, 36 Ohio App.3d 147, 150 (10th Dist.1987). It is the trier of fact's duty to determine whether a break in the chain of custody exists and whether

any break weighs against conviction. *Id.* ("The trier of fact has the task of determining whether a break in the chain of custody exists."), citing *State v. Blumensaadt*, 11th Dist. Lake No. 2000-L-107, 2001-Ohio-4317, *12. "Yet, even then, any deficiencies or irregularities in the chain of custody generally go to the weight of the evidence, not its admissibility." *Glover* at ¶ 30, citing *State v. Steele*, 12th Dist. Butler No. CA2003-11-276, 2005-Ohio-943, ¶ 114.

{¶ 49} We find the testimony presented at trial sufficiently established a chain of custody and that the state met its burden of proving, with reasonable certainty, that substitution, alteration, or tampering of the video did not occur. As discussed above, Edmond testified at trial that he accessed the recordings from January 22, 2018 and provided the recorded audio and video to law enforcement. Edmond also stated that he did not alter the footage of the incident in any way prior to providing the footage to law enforcement officers. Additional testimony at trial revealed the video footage was initially secured by a special agent with the Bureau of Criminal Investigation ("BCI") and that the footage was ultimately "pulled off of the phone" by an analyst at BCI and provided to the London Police Department. The lead detective working on the case indicated that after receiving the video, he saved the recordings and submitted them to Ohio Organized Crime for clarification. After the recordings were clarified, they were returned to the London Police Department. This testimony, coupled with Edmond's and appellant's testimonies that the video was a fair and accurate depiction of the scene and events of January 22, 2018, is sufficient to authenticate the video evidence.

{¶ 50} In light of the above, we find the state met the threshold authentication requirements of Evid.R. 901 and sufficiently established a chain of custody with regard to State's Exhibit 2. As such, we find the trial court did not abuse its discretion in admitting State's Exhibit 2, and therefore, appellant's remaining assignment of error is overruled.

{¶ 51} Judgment affirmed.


PIPER and M. POWELL, JJ., concur.