[Cite as *State v. Brand*, 2023-Ohio-557.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-08-093 |
| | : | O P I N I O N |
| - vs - | | 2/27/2023 |
| | : | |
| MICHAEL P. BRAND, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2020-10-01286

Michael T. Gmoser, Butler County Prosecuting Attorney, and Stephen M. Wagner, Assistant Prosecuting Attorney, for appellee.

Holcomb & Hyde LLC, and Tyler W. Nagel and Richard A. Hyde, for appellant.


**BYRNE, J.**

{¶1} Michael P. Brand appeals from his conviction for gross sexual imposition in the Butler County Court of Common Pleas. For the reasons set forth below, we affirm Michael's conviction.[1]

---

1. We use first names for Michael and his wife to avoid confusion. *See Wiseman v. Wiseman*, 12th Dist. Madison No. CA2022-03-004, 2022-Ohio-3689, ¶ 1, fn. 1.

## I. Procedural and Factual Background

### A. Indictment

{¶2} A Butler County grand jury indicted Michael on two counts of gross sexual imposition ("GSI"), both in violation of R.C. 2907.05(A)(4). Count One alleged that Michael had sexual contact with the victim, who was less than thirteen years of age at the time of the offense. Count Two set forth the same allegations, but concerned a second, separate incident of alleged sexual conduct that allegedly occurred on the same day as the first offense. The indictment arose from allegations that Michael had sexual contact with his daughter, Rose, twice in the same night.[2] The indictment alleged that the incidents occurred on or about February 13, 2009—that is, 11 years earlier—when Rose was 12 years old.

{¶3} Prior to the trial, the state requested leave to amend the indictment to expand the alleged offense dates to between February 6 and February 13, 2009. The trial court granted the request. Otherwise, the allegations of the indictments remained the same.

### B. Jury Trial

{¶4} The matter proceeded to a jury trial. Prior to voir dire, the court heard the parties' arguments on Michael's request—raised in a pretrial motion and again orally before the court—for jury instructions on "mistake of fact" and "accident."[3] After reviewing the parties' written and oral arguments on these requested instructions the court indicated that it would not instruct the jury on "mistake of fact" or "accident."

{¶5} A jury was empaneled and the trial proceeded. We will summarize the trial

---

2. "Rose" is a pseudonym adopted in this opinion for purposes of privacy and readability. *See In re A.P.*, 12th Dist. Warren No. CA2022-01-002, 2022-Ohio-3181, ¶ 2, fn.1; *see also* Ohio Constitution, Article I, Section 10a(A)(1) (requiring that victims in the criminal and juvenile justice systems "be treated with fairness and respect for the victim's safety, dignity, and *privacy*"). (Emphasis added.) We have also adopted a pseudonym, "Allison," for Rose's sister, in order to provide further protection for Rose's privacy.

3. Michael also filed a pretrial motion requesting a jury instruction on sexual imposition under R.C. 2907.04(A)(4), which he argued was a lesser included offense of GSI. This requested instruction was not discussed until later in the trial, as explained further below.

testimony below.

### 1. Testimony of Rose

{¶6} Rose testified that she was born in May 1996. At the time of trial, she had recently turned 25 years old. Rose testified that Michael was her father, and that Katherine Brand ("Kathie") was her mother. Rose testified that she had one sibling, Allison, who was 29 years old.

{¶7} Rose testified that Michael and Kathie lived at 1339 Avalon Drive in Middletown, Ohio. This was also Rose's childhood home. She lived there until June 2019, when she moved out.

{¶8} Rose testified concerning the layout of the family's home. It is a small, Cape Cod-style house. She reviewed various state's exhibits depicting the layout of the home, which included a bird's-eye rendering of the floor plan as well as photographs of the interior of the home.

{¶9} Rose and Allison shared a bedroom located on the home's first floor. If one walked into that bedroom as it existed in 2009, one would walk into Rose's twin-sized bed. Allison slept in a separate bed, next to Rose's bed.

{¶10} Rose and Allison's bedroom adjoined the only functioning bathroom in the home. If one exited the bathroom and turned immediately to the left, one would be facing Rose and Allison's bedroom and could enter it by walking a few steps forward. If, instead, one exited the bathroom, walked several paces forward, and then turned to the left, one would be facing a stairwell leading up to the home's second floor.

{¶11} The second floor contained a bedroom and a non-functioning ensuite bathroom. In 2009, the second-floor bedroom was where Michael and Kathie slept. To move from the second-floor bedroom to the bathroom on the first floor, one would leave the bedroom, travel down a short hallway, turn a corner, walk down a flight of stairs, turn right,

walk several feet, and enter the bathroom.

{¶12} Rose testified that on a Thursday evening in February 2009, Michael was out of town on a business trip. That night, Rose was sleeping in the second-floor bedroom with Kathie. Michael came home from his business trip in the middle of the night. Rose then moved downstairs to her and Allison's bedroom. She fell asleep.

{¶13} According to Rose, what happened next occurred in the early morning hours of Friday, February 13, 2009, in Rose and Allison's bedroom. Rose testified that Michael came into the bedroom and "laid on top of me." Supporting himself with his left arm, Michael reached under Rose's chest but could only "get maybe a couple of inches under me" because Rose was laying on her stomach. "He then proceeded to rub my butt and push his fingers under my pants, only being able to make it under my pants and above my underwear." Michael then placed "his fingers above my underwear and push it into my vagina." Rose further explained that Michael "stuffed" his finger into her vagina, "pushed his finger in" and "moved it around inside my vagina" with "my underwear between myself and his finger." When his hand was on her buttocks, he was rubbing it, in "circular motions."

{¶14} Rose testified that she feigned beginning to wake up. Michael "moved and pulled his hand out and brushed up against me." At that point, she felt what she now, as an adult, recognized as Michael's erection.

{¶15} Michael got up, left the room, and went into the bathroom. Three to five minutes later he came back into the bedroom and laid on top of Rose again. He "tried to rub my butt" and "tried to reach his hand underneath towards my vagina, but I pushed my hips into the bed so that he couldn't. And I moved around again to act like I was waking up so that he would leave, and he did." Rose explained that during this second incident, Michael could not touch her vagina only due to her pushing her hips into the bed. Rose then heard Michael go upstairs to his bedroom.

{¶16} Rose testified she tried to wait 30 minutes for Michael to fall asleep, so that she could then tell her mother what happened. She was unable to wait a full 30 minutes. Her stomach was "really upset." She went upstairs, woke Kathie, and had Kathie come downstairs. Kathie asked her what was wrong. Rose told her, "He touched me." Kathie asked, "Who touched you?" Rose replied, "Dad."

{¶17} Kathie did not ask her where Michael had touched her. Rose said that she did not offer that information because she was crying. Rose further testified that she *never* discussed with Kathie where on her body Michael touched her at any point in time before trial. Rose said that Kathie hugged her and told her to go to bed and that "I'll be right back." Kathie then, "stormed up the stairs." Rose heard her knock a suitcase off the stairs on her way up. Kathie was upstairs for 10 or 15 minutes. Rose could hear talking.

{¶18} Kathie then came back downstairs and brought Rose out of her bedroom so that she would not wake Allison. Kathie told Rose that Michael would be writing her a letter and that he was going to go to work early that morning. Rose recalled Kathie telling her "that I wasn't going to be telling my sister what had happened."

{¶19} Rose stated that she went to school later that morning. Kathie picked her up from school and took her back home. There, Kathie presented her with a letter that Michael had written. It was sealed in an envelope. Rose opened it and tried to read it but was not able to read it because she was crying so much. She recalled the first line said something to the effect of, "I'm sorry I've betrayed your trust." Kathie took the letter and read the rest of it to Rose. Rose could not remember most of it but did recall a line saying that "I would understand when I was older, and that God would forgive him for what he had done."

{¶20} Rose testified that she kept this letter in the top drawer or her dresser for a "long time." Later, she hid it "on top" of Allison's dresser because Allison never moved anything on top of her dresser. Then she moved the letter to a place "underneath the table

- 5 -

runner on our dining room table where we always put mail." She lost track of the letter after that.

{¶21} After reading Michael's apology letter, Kathie asked Rose whether she wanted to stay at the house that weekend or go to her grandparents. Rose chose to go to her grandparents, who lived in Cincinnati. She stayed with her grandparents through Sunday evening.

{¶22} On Sunday evening, Kathie and Michael retrieved Rose from her grandparents. Kathie sat in the backseat with her, which ordinarily "never happened." Rose recalled "shaking so bad that I had to sit on my hands." Michael did not talk to her during the car ride until the very end. She recalled him reiterating some of the comments he had made in the apology letter about how he was sorry, that it was a mistake, and that he would be forgiven.

{¶23} Rose said that after February 13, 2009, she continued sleeping in the room she shared with Allison for a few weeks. Then she moved to the basement where she "had a little more control of my surroundings."

{¶24} Rose stated that she recalled discussing the incident only once more after it occurred. Specifically, she recalled talking to Kathie about it immediately before her thirteenth birthday after she had requested to have a slumber party.

{¶25} Rose never talked to Allison about what happened until the summer of 2019, ten years later. The two had gone to see a performance of the musical "Cats" in downtown Cincinnati. They were having a discussion, and something prompted Allison to ask Rose if she recalled "a letter." Initially, Rose denied knowing what Allison was talking about, but then eventually "broke down crying" and revealed what Michael had done.

{¶26} As to why or how she recalled ten years later that the incident had occurred specifically on February 13, 2009, Rose testified that a week or two after the incident she

"felt like it was something important that I needed to remember when it happened." She explained that she also had an attraction to even numbers and the fact that the date was an odd number "really stood out to me and made it stick in my mind."

## 2. Report to Police and Recorded Conversation

{¶27} Rose reported the incident to the Middletown Police Department in April 2020. The police thereafter arranged for Rose to place a recorded "controlled call" to Michael so she could confront him with her allegations. The state played a recording of the controlled call at trial.

{¶28} Rose began the conversation by telling Michael that she was in therapy and that she had some questions she needed answered. She then asked, "Why would you do that to me?" Though Rose did not provide any context as to what she was referencing, Michael immediately, and without seeking clarification, stated, "It was not my intention * * * I will tell you the same thing I told you the night it happened." Rose objected that Michael did not tell her anything or speak to her the night of the incident, and Michael agreed. Michael then stated:

> I will tell you the same thing I told your mother the night it happened. I remembered going down to go to the bathroom. I remember coming out of the bathroom and going into the bedroom thinking it was our bedroom, your mom and mine. I knew something wasn't right. * * * I climbed in the bed. I knew something wasn't right. I knew something wasn't right. In my memory, like, 10 to 15 seconds 20 seconds later, it's like, I said, no, this isn't this isn't [sic.] right. And got out of bed, thinking that was my bedroom, with Kathie, and went up to bed.

Upon further questioning by Rose, Michael admitted, "I remember crawling in the bed behind somebody that I thought was Kathie." When Rose asked if Michael remembered trying to reach in her pants, Michael stated, "I remember doing, I remember groping on top, between, on top of your clothes, and that was about the time, I, you know, my mind said this isn't right, something's wrong here, I'm not in the right place."

### 3. Objection to Defense E-mail Exhibit

{¶29} During Rose's cross-examination, defense counsel attempted to question her concerning an e-mail she allegedly sent to Michael on February 16, 2009—that is, three days after the date on which Rose testified the incident occurred. In the e-mail, Rose asked Michael to allow her to keep a cat. We will refer to this e-mail as the "Cat E-mail."

{¶30} The state objected on relevancy grounds. Defense counsel stated that the Cat E-mail was relevant to show that the incident did not occur three days earlier, on February 13, 2009. The trial court sustained the state's objection, found the Cat E-mail irrelevant, and excluded it from the trial. Defense counsel proffered the Cat E-mail exhibit outside the presence of the jury, so the Cat E-mail is part of the record on appeal.

### 4. Testimony of Allison Brand

{¶31} Allison Brand testified that in the summer of 2019, Rose took her to see the musical "Cats." While they were on their way home, Allison made a comment about Michael always trusting Rose. This comment triggered a memory that Allison had from when she was a teenager. Allison recalled putting clothes away and finding a small white envelope that had Rose's name on it, written in Michael's handwriting. She remembered opening the envelope and starting to read the letter. She recalled the first line, which said, "I'm sorry I've broken your trust." Allison then became "very uncomfortable." She put the envelope back in the drawer where she found it. She never asked Rose about it until the car ride home from the musical in 2019.

{¶32} Allison stated that Rose was initially unresponsive concerning the letter. But Allison continued to press her and eventually Rose "broke down" and told her that she was molested. Rose said that Michael had come into the bedroom in the middle of the night, had put his hands down her pants and tried to touch her vagina, and that she kept trying to stop it by pushing her hips into the bed.

{¶33} Allison confronted Michael and Kathie with these allegations a few months later. She told them that she knew what Michael had done and that she knew that Kathie had also known about it. Michael initially seemed puzzled. But after Allison confronted him with specifics, such as Rose's age when the incident occurred, he was no longer confused. Kathie "seemed very upset." Michael looked at Kathie and said, "there was one event that she [Kathie] knew about." Allison told Michael that it did not matter how many times it happened and that he had molested his daughter while Allison was sleeping in the same bedroom and that their mother had known about it.

{¶34} Following Allison's testimony, the state rested its case. The defense then called Kathie Brand as its first witness.

### 5. Testimony of Kathie Brand

{¶35} Kathie Brand testified that she believed that the incident occurred on May 21, 2010, when Rose was thirteen years old—not on February 13, 2009, the date testified to by Rose. According to Kathie, Michael had just returned from a trip to North Carolina. Kathie believed that only Kathie and Rose were home. Kathie initially stated that Allison was away at college. However, on further questioning, Kathie stated that Allison was still in high school but, for some uncertain reason, was not at home even though it was a school night.

{¶36} Kathie recalled waking up when Michael went to the bathroom. Five minutes later, he came back to bed. Then, 25 minutes later, Rose came up to the bedroom, tapped her on the shoulder and said she needed to talk to Kathie "now."

{¶37} Kathie and Rose went down to the dining room. Kathie described Rose as "scared," "shaking," and "really visibly upset." They stood there and Rose said to Kathie, "you always said if anybody ever touched us inappropriately, to let you know." Kathie responded, "Who was it? What happened? Rose said, "It was Dad." Kathie testified that she asked Rose where Michael had touched her and Rose said that "he touched her breast,

and that was it." Kathie testified that Rose told her that Michael "didn't go below the belt, he did not go under any of her clothes."

{¶38} Kathie then went upstairs to confront Michael. She yelled and screamed at him. After hearing Michael's explanation, Kathie went back down and stayed with Rose for the rest of the night until it was time to go to school. Kathie picked Rose up from school and took her to Kathie's parents' home for the weekend.

{¶39} On cross-examination, Kathie confirmed that Rose had used the word "breast" to describe where Michael touched. Kathie confirmed that it was Michael's idea to write the apology letter because "he wanted to talk to her," but "she didn't want to talk to him." Kathie remembered that in the letter, Michael said he was sorry, and that he did not know what came over him.

{¶40} Kathie admitted that she stated she could not remember Rose's age when she was interviewed by a police detective and was told that Rose was 12 at the time of the incident. She also admitted that she thought about leaving Michael but did not do so because she was worried that she could not financially support the children on her own part-time salary. She further admitted that she told the detective that after what happened with Rose, she felt like it was her job, as the mom, to be a "buffer" between Rose and her husband and that this was "to keep everybody safe." Nonetheless, Kathie believed that what occurred was an "accident." Kathie explained that it was an "accident" because Michael "thought he was climbing into bed with me." Kathie admitted that she never told the police detective or Rose that Michael thought he was climbing into the bed with her and that the first time she ever said this to anyone was during the trial.

### 6. Testimony of Michael Brand

{¶41} Michael Brand testified that since 1988 he had been employed as a mechanical engineer. His job required him to perform field support and customer support

and required considerable travel. He used calendars as planners for his work schedule. He testified that he went back and looked through his calendars between 2008 and 2012. He produced and described two exhibits, consisting of his calendars for February 2009 and May 2010.

{¶42} Michael's February 2009 calendar indicates that on Monday, February 9, 2009, he flew out of the Cincinnati/Northern Kentucky airport for a visit to "Cork Equipment." He was there most of the week but was back in the local office at 1:30 p.m. on Thursday February 12, 2009. The next day, February 13, 2009, the calendar indicates "Lafarge Visit." Michael testified that Lafarge was in Kentucky and that he would have been on site at 7:00 a.m. that day and it would have taken him approximately one hour to drive there from Middletown.

{¶43} Michael's May 2010 calendar indicated that on Monday May 17, 2010, he traveled to an out-of-state job site and was there through Wednesday, May 19, 2010. He traveled home on Thursday May 20, 2010, and arrived in Cincinnati at 2:30 p.m. Michael stated that he would have gone to the office upon arriving back in Cincinnati and then eventually would have gone home in the afternoon.

{¶44} Michael testified that the incident with Rose occurred the overnight of May 20-21, 2010, when Rose was thirteen years old, and not in February 2009, when Rose was 12. He stated that he knew this because Allison was not home at the time. However, Michael was unclear on why he believed Allison was not home at the time and unclear on why Allison's absence would have been significant with regard to determining the date of the incident.

{¶45} Michael testified that upon arriving home on May 20, 2010, he would have worked around the house until it was dark and then gone to bed before midnight, around 10:00 p.m. At that time, his bedroom was on the second floor. The second floor ensuite

bathroom was not operational at the time; it had ceased working in 2003.

{¶46} Michael testified that he remembered needing to go to the bathroom. He "got up, went down to the bathroom, went to the bathroom, came out of the bathroom, thought that that was my bedroom where it used to be on the first floor." He continued, stating that he "just went in, crawled in bed with [someone] I thought was my wife." Michael testified that he

> went to spoon up behind her, put my arm over her. She would typically grab my hand and clutch it to her – you know, to her chest, heart area, so I was reaching for her hand, trying to find her hand so that she'd do that. At some point in that process, realized that I was not in my room. I was in my daughter's room, in bed with my daughter. [I then] let out a relatively surprised "no." [I] got out of bed, went upstairs, crawled back in bed with my wife, and went back to sleep.

Michael acknowledged that Rose was in the bed and stated that he "put [his] arm around her midsection" and "in the process of searching for [his] wife's hand," he "touched [Rose's] breast." Michael testified that the touching "was on top of the clothing." He vehemently denied that the touching was for the purposes of sexual arousal and denied having an erection. He denied any contact with Rose's vagina or buttocks.

{¶47} After returning to bed in his bedroom, the "next thing" Michael "remember[ed] was waking up to my wife screaming her lungs out at me." Michael said he told her what happened but "I couldn't explain why I thought [Rose's room] was my bedroom, and I didn't expect [Kathie] to believe me." Kathie told him that Rose was "crying and she's shaking."

{¶48} Michael stated that he wanted to apologize to Rose, but that Kathie said that Rose did not want to talk to him. Michael asked Kathie if he could write a letter and she said he could, but Rose may not read it. So, he "wrote a letter of apology to [Rose], put it in an envelope, [and] gave it to [Kathie]." He went to work the next day without seeing either Kathie or Rose.

{¶49} Michael testified that Rose avoided him for a "good few weeks" and "she didn't want to be in close, you know, proximity to me for a period of time after that, but over time that lessened."

{¶50} On cross-examination, the state questioned Michael extensively concerning his claim that he accidentally entered Rose's bedroom and about the path from his bedroom to the first-floor bedroom. Michael stated that he slept on the far side of the king-size bed in the second-floor bedroom. To go to the first-floor bathroom, he would need to walk around the bed and then walk down an eight-foot hallway to reach a stairway with about 15 stairs. Michael admitted that upon leaving the bathroom and entering what he allegedly believed to be his bedroom (that is, Rose and Allison's bedroom), he did not have to walk up a stairway, walk down a hallway, or walk around a king-size bed. He also admitted that he would have necessarily climbed into Rose's twin bed, rather than his king-size bed.

{¶51} Michael testified that he and Kathie had previously used Allison and Rose's bedroom on the first floor as their bedroom for about six years. However, they had not used that bedroom as their own for almost 15 years at the time of the incident.

**7. Jury Instructions, Verdict, and Motion for New Trial**

{¶52} The parties discussed jury instructions at the conclusion of the state's case. Michael again requested jury instructions on "mistake of fact" and "accident," arguing that he should be able to argue that his alleged "accident" or "mistake" of getting into his daughter's bed negated a guilty mental state. The state again opposed this request. The trial court agreed with the state and denied Michael's request for "mistake of fact" or "accident" jury instructions for the same legal reasons it denied those instructions prior to the commencement of trial, but also because, even if the legal defects with the instructions were not present, "the Court finds that it would be factually inappropriate to submit those instructions to the jury."

{¶53} Michael also requested jury instructions on sexual imposition under R.C. 2907.06(A)(1) and sexual imposition under R.C. 2907.06(A)(4). Michael argued that these two offenses were lesser included offenses of GSI. The trial court denied these requested instructions, finding that, under the circumstances, jury instructions for sexual imposition under either subsection were not appropriate because those offenses required proof of different elements not required under the two GSI offenses charged by the state.

{¶54} After deliberating, the jury returned a guilty verdict on Count One, GSI. The jury returned a not guilty verdict on Count Two, GSI. The trial court sentenced Michael to a term of community control.

{¶55} Almost two weeks after the verdict, Michael filed a motion seeking a new trial pursuant to Crim.R. 33(A)(1) and (5). Michael argued he should be given a new trial because the trial court erroneously excluded Rose's Cat E-mail and denied his requested jury instructions on mistake of fact, accident, and sexual imposition. The trial court denied the motion for a new trial.

{¶56} Michael appealed, raising five assignments of error.

## II. The GSI Statute

{¶57} Before addressing Michael's assignments of error, we pause to note that the GSI statute describes five different situations which constitute the crime of GSI. R.C. 2907.05(A)(1)-(5). Michael was convicted under R.C. 2907.05(A)(4), which provides that "No person shall have sexual contact with another, not the spouse of the offender * * * when any of the following applies * * * (4) The other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person."

## III. Law and Analysis

### A. Excluded Cat E-mail

{¶58} Michael's Assignment of Error No. 1 states:

**{¶59}** THE TRIAL COURT ERRED IN EXCLUDING ADMISSIBILE AND PROBATIVE EXCULPATORY EVIDENCE.

**{¶60}** Michael contends that the trial court abused its discretion when it excluded the Cat E-mail exhibit when he sought to introduce it during Rose's cross-examination. The Cat E-mail was an e-mail allegedly sent by Rose to Michael on February 16, 2009—that is, three days after the date on which Rose believed the incident with Michael occurred. In the Cat E-mail, Rose requested that Michael allow the family to keep a pet cat.

**{¶61}** Michael contends that the Cat E-mail was relevant to his defense because it undermined Rose's credibility as to *when* the incident occurred. He argues there existed a substantial likelihood that the outcome at trial would have been different had he been able to show the Cat E-mail to the jury. Michael further contends that the trial court's ruling violated his Confrontation Clause rights under the U.S. Constitution because the ruling prevented him from questioning Rose concerning the Cat E-mail.

### 1. Applicable Law and Standard of Review

**{¶62}** "Evid.R. 402 provides that all relevant evidence is generally admissible." *State v. Singh*, 12th Dist. Butler No. CA2021-12-158, 2022-Ohio-3385, ¶ 45. "Relevant evidence is defined as evidence 'having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *State v. Geddes*, 12th Dist. Fayette No. CA2021-01-001, 2021-Ohio-4115, ¶ 13, quoting Evid.R. 401.

**{¶63}** "As a trial court has broad discretion in the admission or exclusion of evidence, unless the trial court has clearly abused its discretion and the defendant has been

materially prejudiced thereby, an appellate court will not disturb the trial court's decision."[4] *State v. Lark*, 12th Dist. Fayette No. CA2018-03-004, 2018-Ohio-4940, ¶ 35. "An abuse of discretion is more than an error of law or judgment." *State v. Jackson*, 12th Dist. Madison No. CA2019-03-006, 2020-Ohio-2677, ¶ 43. "Rather, it suggests that the trial court's decision was unreasonable, arbitrary, or unconscionable." *State v. Worship*, 12th Dist. Butler No. CA2020-09-005, 2022-Ohio-52, ¶ 12. "An abuse-of-discretion standard of review is a deferential review." *State v. Green*, 12th Dist. Clermont No. CA2019-07-061, 2020-Ohio-1552, ¶ 27. "A reviewing court may not override a trial court's determination that certain evidence is relevant or irrelevant simply because it disagrees with the trial court." *Geddes* at ¶ 14.

**{¶64}** However, to the extent that Michael argues that the trial court's decision to exclude the Cat E-mail violated his Confrontation Clause rights, we apply a de novo standard of review. *State v. Knecht*, 12th Dist. Warren No. CA2015-04-037, 2015-Ohio-4316, ¶ 20 (explaining that "a trial court's ruling as to the admissibility of evidence will not be reversed absent an abuse of discretion," but that "we review a claim that a criminal defendant's rights have been violated under the Confrontation Clause de novo").

### 2. Legal Analysis

**{¶65}** The Cat E-mail is reproduced below in full:

```
From:       Kathie Brand
Sent:       Monday, February 16, 2009 9:43 PM
To:         Mike Brand
```

---

4. Michael argues that we should apply a de novo standard of review when analyzing the trial court's decision to exclude the Cat E-mail, rather than an abuse of discretion standard of review. In support, Michael cites *State v. Wright*, 4th Dist. Lawrence No. 16CA24, 2017-Ohio-9041, ¶ 25. In *Wright*, the Fourth District explained that "When * * * an appellant alleges that a trial court's evidentiary ruling was based on an erroneous standard or a misconstruction of the law, an appellate court reviews the trial court's evidentiary ruling using a de novo standard of review." *Id.* (Quotations removed.) The Fourth District applied de novo review because the trial court's admissibility decision was based on its misapplication of the law regarding the timing of objections. *Id.* at ¶ 27. Here, Michael has not argued that the trial court applied "an erroneous standard or a misconstruction of the law" that affected its admissibility decision, so we apply an abuse-of-discretion standard when reviewing the trial court's decision regarding relevance.

Subject:    the cat

dear dad,

I am just wondering if you would give the cat a chance because you never keep an open mind and if i get rid of this cat it will feel if sam is dieing all over again and I couldnt go throught that pain. Mom and I have cried because we could not imagine giving her too paws and Mom feels bad because she cant do anything to make me feel better. I know that I cant go tomorrow to give the cat to paws because I wouldnt stop crying. I am just asking you to give her chance because we all lover her and I would at least like to give her to someone we know instead of some we dont even known and I dont think that she will do very well in the home she would be going to because she doesnt get along with other cats. Please dont let her go I just whant you to give her a chance I willing to buy every thing she would need and I would vacume every other day and I would just and vacume and alwas clean up my side of the room no matter what. Please just give her a chance.

Love,
[Rose]

(Errors in original.)

**{¶66}** Michael contends that the content, tone, and timing of the Cat E-mail casts doubt on Rose's credibility with regard to her assertion that the incident occurred on February 13, 2009. We disagree.

**{¶67}** First, the content of the Cat E-mail is irrelevant to whether Michael had sexual contact with Rose several nights earlier. The text of the Cat E-mail does not mention or relate to the incident, and instead is nothing more than a child's attempt to convince a resistant parent to allow her to keep a pet cat. The content of the Cat E-mail does not make it relevant.

**{¶68}** Second, Michael argues that the tone of the e-mail, and its use of the phrase, "Love, [Rose]" is inconsistent with Rose's assertion that the incident occurred three days prior to the day she sent the Cat E-mail. In other words, Michael suggests that Rose would not have sent him correspondence with the tone used in the Cat E-mail so soon after the

- 17 -

incident. However, the tone of the Cat E-mail is not probative to the issue of whether Michael had sexual contact with Rose several days earlier. It is commonly understood that children do not behave like adults would under the same circumstances, and they do not communicate or write like adults. A child signing "Love" is nothing more than a standard sign-off, similar to the traditional "Dear" at the beginning of a letter. Any attempt to glean clues about Rose's psychological or emotional state at the time Rose sent the Cat E-mail would be purely speculative. The tone of the Cat E-mail is therefore irrelevant.

{¶69} Third, the timing of the Cat E-mail does not make it relevant, for the same reasons that we have explained the content and tone of the Cat E-mail do not make the e-mail relevant.

{¶70} In sum, it was not an abuse of discretion for the trial court to conclude that the Cat E-mail—a request by a child to keep a pet—does not make it any less or more likely that Michael committed GSI several days earlier.

{¶71} Even if we might have been inclined to allow the jury to consider the Cat E-mail and even if the trial court had abused its discretion in denying admission of the Cat E-mail, Michael is still required to prove that he was "materially prejudiced" by the exclusion of the e-mail in order for us to disturb the trial court's decision. *State v. Jackson*, 12th Dist. Madison No. CA2019-03-006, 2020-Ohio-2677, ¶ 43. "As a legal term, "prejudice" is simply '[d]amage or detriment to one's legal rights or claims.'" *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 23, quoting *Black's Law Dictionary* 1218 (8th Ed.1999).

{¶72} Michael proffered the Cat E-mail, but he failed to proffer the cross-examination of Rose that he would have conducted. Michael could have cross-examined Rose regarding the Cat E-mail outside the presence of the jury to make a record for our review to determine if he sustained material prejudice as a result of the trial court's exclusion of the e-mail. In the absence of such a proffer, we simply review the record to determine if

Michael was materially prejudiced.

{¶73} We cannot find any support in the record for the conclusion that admission of the Cat E-mail would have changed the trial outcome. Michael never claimed that Rose was lying about an incident occurring in her bed involving him. Instead, he promoted his alternative version of events to suggest that the incident occurred in May 2010, when Rose was thirteen, and only involved what amounted to an inadvertent brushing of Rose's breast. The jury weighed Michael's testimony and evidence against Rose's contrary testimony and evidence, which would necessarily include her stated reasons for being so confident in the date of the offense. The jury found Rose credible and did not find Michael or Kathie credible. *See State v. Glover*, 12th Dist. Brown No. CA2015-01-002, 2015-Ohio-3707, ¶ 37 ("[A]s the trier of fact, the jury was free to believe or disbelieve all, part, or none of the testimony of the witnesses presented at trial"). We do not believe that an irrelevant e-mail written by Rose when she was a child concerning keeping a pet cat would have been the key to the jury rejecting Rose's credibility as an adult and accepting Michael's version of events.

{¶74} As a result, even if the trial court had abused its discretion in excluding the Cat E-mail (which we do not find), we find that Michael still has not shown that the trial court's exclusion of the Cat E-mail caused him material prejudice requiring reversal. *State v. King*, 12th Dist. Warren No. CA2018-04-047, 2019-Ohio-833, ¶ 16 ("As a trial court has broad discretion in the admission or exclusion of evidence, unless the trial court has clearly abused its discretion *and the defendant has been materially prejudiced thereby*, an appellate court will not disturb the trial court's decision") (Emphasis added.). Because the Cat E-mail had no effect on Michael's legal claims—damaging, detrimental, or otherwise—its exclusion is neither "materially" prejudicial, nor prejudicial at all.

{¶75} Michael also argues that the trial court's ruling constituted a violation of his rights under the Confrontation Clause of the United States Constitution. Specifically, he

argues that because "counsel could not question Rose regarding the email," he was prevented from "fully and adequately confronting the lone eyewitness the state produced against him." In support, Michael cites *State v. Mills*, 9th Dist. Medina No. 02CA0037-M, 2002-Ohio-7323, ¶ 47, quoting *Stow v. Berchenko*, 9th Dist. Summit No. 17197, 1995 WL 655929, * 1 (Nov. 8, 1995), for the proposition that the Confrontation Clause requires a reviewing court to determine "'whether the defendant was denied an opportunity for effective cross-examination.'" *Id.*

{¶76} But Michael's quotation from *Mills* must be understood in context. In *Mills*, the Ninth District explained:

> [T]he Ohio Supreme Court has held that although the "cross-examination of a witness is a matter of right, * * * the 'extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.'" *State v. Green* (1993), 66 Ohio St. 3d 141, 147, 609 N.E.2d 1253, quoting *Alford v. United States* (1931), 282 U.S. 687, 694, 75 L.Ed. 624, 51 S.Ct. 218. *See, also, State v. Palmer* (Feb. 8, 1995), 9th Dist. No. 2323-M, 1995 Ohio App. LEXIS 514, at *19. Therefore, a trial court is given considerable discretion "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *State v. Lute* (Nov. 22, 2000), 9th Dist. No. 99 CA007431, 2000 Ohio App. LEXIS 5443, at *23, quoting *Van Arsdall* (1986), 475 U.S. at 679. It is within a trial court's discretion to determine whether testimony is relevant, and an appellate court may not interfere with a trial court's decision absent an abuse of discretion. *State v. Younker*, 2nd Dist. No. 02 CA1581, 2002 Ohio 5376, at ¶ 9.
>
> As the Confrontation Clause guarantees only an opportunity for effective cross-examination, and not cross-examination to whatever extent the defense may wish, an appellate court reviewing restrictions imposed on the scope of cross-examination must determine "whether the defendant was denied an opportunity for effective cross-examination." *Stow v. Berchenko* (Nov. 8, 1995), 9th Dist. No. 17197, 1995 Ohio App. LEXIS 4987, at *3, *citing State v. Lopez* (1993), 90 Ohio App. 3d 566, 575, 630 N.E.2d 32, quoting *Delaware v. Fensterer* (1985, 474 U.S. 15, 19-20, 88 L.Ed. 2d 15, 106 S. Ct. 292.

*Id.* at ¶ 46-47. In other words, while *Mills* acknowledged that the Confrontation Clause requires a defendant to have the opportunity for effective cross-examination, it also acknowledged that this principle does not prevent a trial court from applying its sound discretion in excluding evidence that is not relevant. *Id.* The *Mills* court applied this principle in analyzing a trial court's ruling that a defendant could not question a police sergeant about a particular prior statement and the time it took to arrest the defendant. *Id.* at ¶ 48. The court explained:

> Upon review of the record in this case, we cannot say that Mills was denied the opportunity for effective cross-examination of [the police sergeant]. The trial court imposed reasonable limits on the cross-examination of [the police sergeant] to prevent confusion of the issues and interrogation that was repetitive or *only marginally relevant*.

(Emphasis added.) *Id.* On this basis the *Mills* court overruled Mills' Confrontation Clause assignment of error. *Id.*

**{¶77}** Likewise, in this case the trial court excluded the Cat E-mail because it determined that the e-mail was not relevant. For the reasons explained above, this was not an abuse of discretion. Michael was therefore not denied his Confrontation Clause rights. *Mills* at ¶ 46-48.

**{¶78}** For the foregoing reasons, we overrule Michael's Assignment of Error No. 1.

### B. Jury Instructions

**{¶79}** Michael's Assignment of Error No. 2 states:

**{¶80}** THE TRIAL COURT ERRED IN REFUSING TO GIVE APPELLANT'S REQUESTED JURY INSTRUCTIONS.

**{¶81}** Michael argues that the trial court abused its discretion when it refused his request to instruct the jury on "mistake of fact" and "accident." Michael further argues that the trial court abused its discretion by denying his request to instruct the jurors on two forms

of sexual imposition, which he argues are lesser-included offenses of GSI.

**1. Standard of Review**

{¶82} "Jury instructions are matters which are left to the sound discretion of the trial court." *State v. Carreiro*, 12th Dist. Butler No. CA2011-12-236, 2013-Ohio-1103, ¶ 13. Accordingly, "[w]hen reviewing a refusal to give a requested jury instruction, an appellate court considers whether the trial court's refusal was an abuse of discretion under the facts and circumstances of the case." *State v. Palmer*, 12th Dist. Clermont No. CA2021-07-035, 2022-Ohio-2181, ¶ 14.

{¶83} "Ordinarily, requested instructions should be given if they are correct statements of the law, applicable to the facts in the case, and reasonable minds could reach the conclusion sought by the specific instruction." *Carreiro* at ¶ 14. However, "the trial court is not required to include proposed jury instructions which are repetitive and would simply confuse the jury." *State v. Ossege*, 12th Dist. Clermont Nos. CA2013-11-086 and CA2013-11-087, 2014-Ohio-3186, ¶ 40. Therefore, "'[i]n reviewing a trial court's decision on jury instructions, an appellate court's role is to ascertain whether the trial court abused its discretion in refusing to give a proposed instruction, and, if so, whether that refusal was prejudicial.'" *Id.*, quoting *State v. Ray*, 12th Dist. Butler No. CA2012-10-213, 2013-Ohio-3671, ¶ 25.

**2. Proposed Jury Instructions on "Mistake of Fact" and "Accident"**

{¶84} We first turn to the question of whether the trial court abused its discretion when it denied Michael's proposed jury instructions on "mistake of fact" and "accident."

{¶85} "Mistake of fact is a defense if it negates a mental state required to establish an element of a crime." *In re A.C.D.*, 12th Dist. Warren No. CA2014-06-085, 2015-Ohio-232, ¶ 15. "Mistake of fact is widely recognized as a defense to specific intent crimes when the defendant has an honest purpose and the honest purpose provides an excuse for an

act that would otherwise be deemed criminal." *Id.* "As such, mistake of fact can, in an appropriate circumstance, negate a knowing mental state." *Id.*

{¶86} "Accident" is similar to "mistake of fact," but the concepts are not the same. Accident "'is a factual defense that denies that the accused acted with the degree of culpability or mens rea required for the offense, when that involves purposeful conduct.'" *State v. Jones*, 12th Dist. Butler No. CA2015-02-020, 2015-Ohio-5029, ¶ 17, quoting *In re F.D.*, 8th Dist. Cuyahoga No. 102135, 2015-Ohio-2405, ¶ 32. "The concept of accident is tantamount to a denial that the act was intentional." *State v. Fears*, 86 Ohio St.3d 329, 340, 1999-Ohio-111. In other words, accident constitutes "an argument that supports a conclusion that the state has failed to prove the intent element of the crime beyond a reasonable doubt." *State v. Atterberry*, 119 Ohio App.3d 443, 447 (8th Dist.1997).

{¶87} To summarize, "mistake of fact" negates a specific intent element of a crime when a defendant acted intentionally but acted based on mistaken information or belief, while "accident" negates a specific intent element of a crime when a defendant acted unintentionally.

{¶88} As a reminder, Michael was convicted of GSI under R.C. 2907.05(A)(4). R.C. 2907.05(A)(4) states, "No person shall have sexual contact with another, not the spouse of the offender * * * when any of the following applies * * * (4) The other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person."

{¶89} Michael argues that GSI under R.C. 2907.05(A)(4) is not a strict liability offense because the mens rea of "purpose" applies to the "sexual contact" element of the offense. He further argues that the trial court erred when it denied his requested "mistake of fact" and "accident" jury instructions based on its mistaken belief that those jury instructions related to the *age* element of GSI under R.C. 2907.05(A)(4). Michael argues that the instructions rather concerned the "*identity* of the victim" element. (Emphasis

- 23 -

added.) Michael argues that the "purpose" element in the definition of "sexual contact" also applies to the "identity" element of GSI.

**{¶90}** The Ohio Supreme Court considered whether GSI under R.C. 2907.05(A)(4) was a strict liability offense in *State v. Dunlap*, 129 Ohio St.3d 461, 2011-Ohio-4111. The supreme court pointed out that the statute prohibits sexual contact when the victim is "less than thirteen years of age, *whether or not the offender knows the age of that* person." (Emphasis added.) *Id.* at ¶ 18, quoting R.C. 2907.05(A). On that basis the supreme court concluded that "[t]here is no question that the victim's age is a strict-liability element of an R.C. 2907.05(A)(4) violation." *Id.* at ¶ 18.

**{¶91}** But while the Ohio Supreme Court held that age was a strict-liability element of GSI under R.C. 2907.05(A)(4), the supreme court further held that GSI does possess a mens rea element. *Id.* at 19. Specifically, the supreme court pointed to R.C. 2907.01(B)'s definition of "sexual contact" (a phrase used in R.C. 2907.05[A][4]):

> "Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, *for the purpose* of sexually arousing or gratifying either person.

(Emphasis added.) Based on this definition, the supreme court held that GSI requires proof of touching "for the *purpose* of sexually arousing or gratifying either person." (Emphasis sic.) *Dunlap* at ¶ 25.

**{¶92}** Michael argues that the "purpose" mens rea contained in the R.C. 2907.01(B) definition of "sexual contact" as used in R.C. 2907.05(A) also applies to the phrase "not the spouse of the offender." Michael is incorrect. The R.C. 2907.01(B) definition of "sexual contact is *only* a definition of "sexual contact." "Sexual contact" as used in R.C. 2907.05(A) does not modify the phrase, "not the spouse of the offender." Instead, the phrase "not the spouse of the offender" modifies the word "another" in the phrase "No person shall have

sexual contact with *another*." (Emphasis added.) There is no textual reason for concluding that the mens rea of "purpose" that applies to "sexual contact" also applies to "not the spouse of the offender." And while the mens rea of "purpose" applies to "sexual contact," the phrase "not the spouse of the offender," as read in the overall context of R.C. 2907.05(A), plainly indicates a purpose to impose strict criminal liability with respect to that element of the offense (which Michael refers to as the "identity" element). This is the case because a person either is or is not another's spouse. "'To discern legislative intent, we read words and phrases in context and construe them in accordance with rules of grammar and common usage.'" *Lovejoy v. Diel*, 12th Dist. Butler No. CA2020-06-067, 2021-Ohio-1124, ¶ 31, quoting *Mahoning Edn. Assn. of Dev. Disabilities v. State Emp. Relations Bd.*, 137 Ohio St.3d 257, 2013-Ohio-4654, ¶ 15. To hold, as Michael argues we should, that the identity element of GSI requires the mens rea of "purpose" would mean that strict liability applies to the age of the offender, *except* when the offender claims to have incorrectly believed that the victim was the offender's spouse. This makes no sense in the context of the full statutory text. There is no lawful basis for jury instructions stating that the mens rea of "purpose" applies to the identity element ("not the spouse of the offender") in R.C. 2907.05(A).

{¶93} In any event, the text of the proposed "mistake of fact" and "accident" jury instructions requested by Michael on their own terms apply those concepts to the *age* element of R.C. 2907.05(A)(4), not to the *identity* element. Michael's proposed "mistake of fact" instruction concludes by stating that if Michael had an "honest belief" that he was engaged in sexual contact with Kathie, rather than Rose, then "he is not guilty of the crime of gross sexual imposition, as a purpose to engage in sexual contact with a person less than thirteen years of age [is] an essential element of that offense." Likewise, Michael's proposed "accident" jury instruction states that "The defendant denies any purpose to have

sexual contact with a person less than thirteen years of age." The proposed instruction goes on to state that if the jury, after considering the evidence, is not convinced beyond a reasonable doubt that Michael "had a purpose to have sexual contact with a person less than thirteen years of age, you must return a verdict of not guilty." Both instructions are about the age element (not the identity element), misstate the law with respect to the age element, and would have confused the jury.[5] The trial court did not abuse its discretion.

{¶94} We also note that even if the trial court had abused its discretion in denying the requested "mistake of fact" and "accident" jury instructions (which it did not), we find that Michael was not prejudiced. *Ossege*, 2014-Ohio-3186, at ¶ 40. The trial court permitted both Michael and Kathie to testify that Michael mistakenly believed that he was lying down in their marital bed and that Michael believed the person he touched was Kathie, not Rose. The trial court also permitted the jury to hear the recording of Rose's controlled call with Michael, in which Michael made similar statements. Likewise, the trial court permitted Michael's defense counsel to state in closing argument that Michael mistakenly believed that he was in bed with and touching Kathie, rather than Rose. The trial court presumably allowed this testimony and these arguments because they were related to Michael's argument that he did not touch Rose for the purpose of sexual arousal or gratification—as permitted by *Dunlap*. *Dunlap*, 2011-Ohio-4111, at ¶ 25. Having heard Michael's testimony regarding his alleged mistake, the jury clearly found the testimony not credible, because it convicted Michael of GSI. There is no reason to believe the jury would have reached a different result if it had been instructed on "mistake of fact" and "accident."

### 3. Proposed Jury Instruction on Sexual Imposition Under R.C. 2907.06(A)(1) and (A)(4)

---

5. Michael repeatedly characterized the jury instructions as not relating to the age element, but the text of the proposed jury instructions speaks for itself. Michael did not propose alternative jury instructions.

{¶95} The state charged and the jury convicted Michael of one count of GSI. As discussed previously, the relevant portion of the GSI statute provides: "No person shall have sexual contact with another, not the spouse of the offender * * * when * * * (4) [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.05(A)(4).

{¶96} Michael contends that he was entitled to jury instructions on sexual imposition under R.C. 2907.06(A)(1) and under R.C. 2907.06(A)(4). Michael claims that both of these sexual imposition offenses are lesser included offenses of GSI, and that reasonable jurors could have found him not guilty of GSI but guilty of either of the two sexual imposition offenses.

{¶97} "In considering whether an instruction upon a lesser offense should be given, a trial court must first determine whether an offense is a lesser included offense of the crime charged." *State v. Hines*, 12th Dist. Clermont No. CA2017-06-025, 2018-Ohio-1780, ¶ 25. "If that inquiry is answered affirmatively, then the court must proceed to determine whether the evidence in the case supports an instruction on the lesser included offense." *Id.*

{¶98} "The test for determining if an offense is a lesser included offense of another crime is met when (1) one offense carries a greater penalty than the other, (2) some element of the greater offense is not required to prove commission of the lesser offense, and (3) the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed." *State v. Villafranco*, 12th Dist. Clinton No. CA2021-09-029, 2022-Ohio-2826, ¶ 13. "Thus, the three-prong test includes a 'greater penalty' prong, an 'element' prong, and a 'concurrent commission' prong." *State v. Hale*, 12th Dist. Clermont No. CA2018-04-024, 2019-Ohio-1398, ¶ 11.

{¶99} "The test for determining if an offense is a lesser included offense of another does not involve a consideration of the facts of the offense." *Hines* at ¶ 27. Instead, the

test "requires a comparison of the elements of the respective offenses in the abstract to determine whether one element is the functional equivalent of the other. If so, and if the other parts of the test are met, one offense is a lesser included offense of the other." *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, ¶ 25.

{¶100} We will separately analyze Michael's arguments regarding the requested sexual imposition instructions under R.C. 2907.06(A)(1) and 2907.06(A)(4).

**a. Sexual Imposition Under R.C. 2907.06(A)(1)**

{¶101} The Revised Code defines sexual imposition in violation of R.C. 2907.06(A)(1) as:

> No person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard.

This offense requires proof of elements that are not elements of GSI under R.C. 2907.05(A)(4). Namely, the state must prove (1) that the sexual contact is offensive to the victim, and (2) the offender's knowledge of the offensive nature of the sexual contact, or recklessness in that regard. R.C. 2907.06(A)(1). Because these elements of sexual imposition under R.C. 2907.06(A)(1) are not elements of GSI under R.C. 2907.05(A)(4), it is *theoretically* possible that an offender could commit GSI under R.C. 2907.05(A)(4) without also committing sexual imposition in violation of R.C. 2907.06(A)(1). Accordingly, sexual imposition under R.C. 2907.06(A)(1) is not a lesser included offense of GSI under R.C. 2907.05(A)(4). *Villafranco*, 2022-Ohio-2826, at ¶ 13 (lesser included offense test includes whether "the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed").

{¶102} We therefore find that the trial court did not abuse its discretion in refusing Michael's request to instruct the jurors on sexual imposition under R.C. 2907.06(A)(1).

### b. Sexual Imposition Under R.C. 2907.06(A)(4)

{¶103} The Revised Code defines sexual imposition in violation of R.C. 2907.06(A)(4) as,

> No person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person * * * is thirteen years of age or older but less than sixteen years of age, whether or not the offender knows the age of such person, and the offender is at least eighteen years of age and four or more years older than such other person.

{¶104} The distinction between this statute and the GSI statute at issue here is plain. GSI under R.C. 2907.05(A)(4) requires proof of a victim *less* than 13 years of age. Sexual imposition under R.C. 2907.06(A)(4) requires proof of a victim *between* 13 and 16 years of age *and* evidence concerning the age of the offender. Thus, if a factfinder convicts an offender of GSI under R.C. 2907.05(A)(4), then the factfinder must have found beyond a reasonable doubt that the victim was under 13 years of age. Such a finding would by definition preclude the factfinder from finding the offender guilty of sexual imposition under R.C. 2907.06(A)(4). Accordingly, GSI under R.C. 2907.05(A)(4) can be committed without also committing sexual imposition under R.C. 2907.06(A)(4). Further, sexual imposition under R.C. 2907.06(A)(4) requires the state to prove that the offender "is at least eighteen years of age and four or more years older than such other person." This is not an element of GSI under R.C. 2907.05(A)(4). As such, sexual imposition under R.C. 2907.06(A)(4) is not a lesser included offense of GSI under R.C. 2907.05(A)(4). *Villafranco*, 2022-Ohio-2826, at ¶ 13 (lesser included offense test includes whether "the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed" and whether "some element of the greater offense is not required to prove commission of the lesser offense").

{¶105} For the foregoing reasons, we overrule Michael's Assignment of Error No. 2.

### C. Due Process Right to a Fair Trial

{¶106} Michael's Assignment of Error No. 3 states:

{¶107} THE TRIAL COURT ERRED IN PREVENTING APPELLANT FROM PRESENTING HIS VERSION OF THE FACTS.

{¶108} Michael contends that the trial court's refusal to allow him to present the jury with a defense based on "mistake of fact" and "accident" constituted a violation of his fundamental due process right to a fair trial.  Michael cites various rulings by the trial court limiting his counsel's ability to argue his alleged mistake in believing that Rose was Kathie when he touched her in bed.

{¶109} As discussed above, GSI is a strict liability offense and Michael's argument that he believed he was touching his then 44-year-old wife rather than his 12-year-old daughter is legally irrelevant to the offense as far as it relates to the age and identity of the victim.  For the reasons discussed above with respect to Assignment of Error No. 2, the trial court did not deprive Michael of a fair trial or deny him due process of law by not instructing the jurors on "mistake of fact" and "accident," or by precluding counsel from arguing these points with respect to the identity element of GSI during opening and closing.

{¶110} Despite the inapplicability of a "mistake of fact" or "accident" instruction, Michael testified during his case-in-chief that he believed he was getting into bed with Kathie.  Michael reiterated that claim in the controlled call played by the state.  Kathie also testified that Michael accidentally believed he was getting into bed with her.  Michael's counsel emphasized this testimony in his closing argument.  Thus, Michael cannot claim that the trial court's rulings prevented him from telling the jury his version of events.

{¶111} We overrule Michael's Assignment of Error No. 3.

### D. Motion for New Trial

{¶112} Michael's Assignment of Error No. 4 states:

{¶113} THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL.

{¶114} Michael argues that the trial court erred by denying his request for a new trial based upon Crim.R. 33(A)(1) and (5). The errors Michael relied on in requesting a new trial are those alleged errors that he previously assigned in this appeal, i.e., the exclusion of the Cat E-mail and the trial court's refusal to give his requested jury instructions on "mistake of fact," "accident," and sexual imposition.

### 1. Standard of Review

{¶115} "The decision to grant or deny a motion for a new trial pursuant to Crim.R. 33 rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Brown*, 12th Dist. Preble No. CA2022-02-003, 2023-Ohio-258, ¶ 19.

### 2. Motion for New Trial

{¶116} Crim.R. 33(A) provides that "[a] new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

> Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;
>
> * * *
>
> (5) Error of law occurring at the trial * * *

{¶117} For the reasons articulated above in response to Michael's Assignments of Error Nos. 1 and 2, the trial court did not abuse its discretion or commit an error of law in excluding the Cat E-mail or by refusing Michael's requested jury instructions and the court's orders did not deprive Michael of a fair trial. As such, the court did not err in denying Michael's request for a new trial under Crim.R. 33.

{¶118} We overrule Michael's Assignment of Error No. 4.

**E. Manifest Weight**

{¶119} Michael's Assignment of Error No. 5 states:

{¶120} APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶121} Michael argues that the jury lost its way in finding him guilty. He contends that there were disputed facts and issues of credibility with respect to Rose's age at the time of the offense and as to whether his physical contact with Rose was for purposes of sexual arousal or gratification.

{¶122} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶123} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to give to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-466, ¶ 15.

{¶124} Upon review, we find that this is not the exceptional case where the evidence

weighed heavily against the conviction. *Zitney* at ¶ 15. The record contains competent and credible evidence that Michael touched Rose in an erogenous zone for the purposes of his sexual arousal when she was 12 years old.

{¶125} Regarding her age, Rose testified concerning her certainty as to the February 13, 2009 date. She explained her recognition, even as a child, that what happened was important and she should remember the date. Rose further described her interest in numbers and how that interest helped imprint the date in her memory. Rose further testified that she recalled discussing the incident with Kathie immediately prior to her thirteenth birthday party, which would confirm that the incident occurred in 2009 rather than 2010. Michael's calendar for February 2009 corroborated Rose's testimony. That calendar confirmed that Michael was out of town earlier that week and returned home on Thursday, February 12, 2009. His visit to Lafarge early the next morning, Friday, February 13, 2009, was consistent with the testimony that he would be leaving for work early the morning after the incident. Allison testified that when she confronted her parents, Michael appeared confused until she mentioned specifics, such as Rose's age at the time of the offense. Michael and his wife both testified as to their certainty that the event occurred over a year later and Michael presented a calendar that purported to corroborate his claim. The jury heard his testimony, as well as Kathie's testimony. The jury found Rose to be a more credible than both parents. We generally defer to the factfinder on matters of witness credibility. *State v. Statzer*, 12th Dist. Butler No. CA2015-08-148, 2016-Ohio-7434, ¶ 25.

{¶126} Concerning sexual arousal or gratification, Rose described Michael rubbing her buttocks in a circular motion and attempting to push his fingers through her underwear into her vagina. Rose testified that she felt what she later realized was Michael's erection. The jury may have concluded that Michael corroborated Rose's claims that the touching was for sexual purposes when, during the controlled call, he stated, " * * * I remember

groping on top, between, on top of your clothes * * *." Specifically, the jury may have viewed Michael's reference to "groping" (made at a time when he did not know he was being recorded) as more consistent with Rose's trial testimony than his own trial testimony. The jury may have likewise concluded that Michael's halting reference to groping "between, on top of your clothes" was consistent with Rose's description of Michael's reaching under her pants but with her underwear still between his fingers and her vagina.

{¶127} Michael's alternative version of events was that he briefly brushed Rose's breast over her clothing before suddenly realizing he was not in his own bedroom with his wife. The jury likely found this story not credible for numerous reasons. For one thing, accepting Michael's account would require the jury to believe that he thought he had returned to his upstairs bedroom, despite not having walked up the stairs or down the upstairs hallway and around his bedroom to his side of the bed. Alternatively, it would require the jury to believe that after fifteen years of sleeping upstairs, he suddenly and inexplicably mistook his old bedroom downstairs as his current bedroom. For another, it would require the jury to believe that Michael thought he had laid down in his king-size bed rather than Rose's twin bed, and that he was fondling his adult wife's breast rather than that of a young girl.[6] Again, the jury obviously found Rose to be a more credible witness than Michael regarding to the issue of sexual contact and we defer to that finding. *Statzer* at ¶ 25. But we note that Kathie's description of Rose's behavior that morning corroborated Rose's claim concerning sexual contact. Kathie described Rose as "really visibly upset and shaken." This description is more consistent with the invasive sexual contact described by Rose, rather than the brief, benign touching claimed by Michael.

---

6. The state presented photographs of Rose and Kathie roughly contemporaneous with the offense in 2009. The photographs showed a noticeable difference in Rose's and Kathie's build and weight, suggesting it would have been immediately obvious to Michael that he was not in bed with Kathie.

**{¶128}** Michael presents various other arguments challenging Rose's reliability. He argues that her story evolved over time, that she did not tell Kathie any details about what Michael did the night of the event, and that the first time she reported her allegations was approximately ten years after the fact. Michael asserts that his versions of events as told at trial and during the controlled call were consistent.

**{¶129}** Trial counsel thoroughly cross-examined Rose about these issues and other credibility matters. These issues were presented to the jury for consideration. The jury was free to assign whatever weight it determined appropriate in assessing the truthfulness of Rose's testimony. *See State v. Barron*, 12th Dist. Warren No. CA2020-12-088, 2022-Ohio-102, ¶ 100.

**{¶130}** Finally, Michael argues that the fact that the jury found him not guilty of Count Two underscores the fact that the jury had questions about Rose's credibility. We disagree. Rose's testimony was that upon returning from the bathroom Michael *tried* to touch her buttocks and *tried* to touch her vagina but he was unsuccessful only because of her actions of pushing her hips into the bed.[7] The fact that the jury found Michael not guilty of Count Two indicates not that the jury lost its way with respect to Count One, but that the jury was paying attention to the evidence presented and determined that the state had not met its burden beyond a reasonable doubt concerning Count Two.

**{¶131}** For these reasons, we find that the weight of the evidence supported Michael's conviction and the jury did not lose its way. We overrule Michael's Assignment of Error No. 5.

### IV. Conclusion

**{¶132}** The trial court did not abuse its discretion in refusing to admit the Cat E-mail

---

7. Rose later clarified that Michael did touch her buttocks during this second incident, though without providing additional detail as to the nature of the contact.

and in refusing to instruct the jurors on "mistake of fact," "accident," and sexual imposition. For the same reasons, the court did not violate Michael's due process rights and did not err in declining to grant him a new trial. The weight of the evidence supported Michael's conviction.

{¶133} Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.